1 James Wesley Kinnear (CA State Bar No. 124771)
Adria Y. LaRose (CA State Bar No. 148616)
2 HOLME ROBERTS & OWEN LLP
One Maritime Plaza, Suite 2400A
3 San Francisco, CA  94111
Telephone: 415.268.2000
4 Facsimile: 415.268.1999

5
Jeffery M. Lillywhite (Admitted Pro Hac Vice)
6 HOLME ROBERTS & OWEN LLP
299 South Main Street, Suite 1800
7 Salt Lake City, UT  84111
Telephone: 801.521.5800
8 Facsimile: 801.521.9639

9
Attorneys for Defendant/Counterclaimant
10 USANA HEALTH SCIENCES, INC.

11

12

13                   UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
14                    SAN FRANCISCO DIVISION

15

16 CREAGRI, INC.,                          CASE NO. C 03 3216 MMC

17                 Plaintiff,              **E-FILING**

18        v.                               MEMORANDUM OF POINTS &
                                           AUTHORITIES OF DEFENDANT/
19 USANA HEALTH SCIENCES, INC.,            COUNTERCLAIMANT USANA HEALTH
                                           SCIENCES IN SUPPORT OF MOTION FOR
20                 Defendant.              SUMMARY JUDGMENT

21                                         Date:   January 21, 2005
   AND RELATED COUNTERCLAIMS              Time:  9:00 a.m.
22                                         Location: Courtroom 7, 19th Floor

23                                                  Honorable Maxine M. Chesney

24

25

26

27

28

**TABLE OF CONTENTS**

I.     PRELIMARY STATEMENT...................................................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................3

       A.    The Companies And Their Products.................................................3

       B.    USANA's Olivol Trademark Has A Priority Date of June 18, 2002 On The
             Principal Register ....................................................................5

       C.    CreAgri's OLIVENOL Tradename Is Not A Registered Trademark: It Is A
             "Deceptively Misdescriptive" Mark Registered Only On The Supplemental
             Register ................................................................................6

       D.    CreAgri's OLIVENOL Contains Only A Fraction Of The Sole Nutrient Claimed
             On Its Label, And It Contains No Olive Oil ....................................7

       E.    CreAgri Sold Almost No OLIVENOL Before June 18, 2002 ......................9

       F.    CreAgri Had Done Almost Nothing To Establish Secondary Meaning in
             OLIVENOL Before June 18, 2002 ...............................................10

III.   ARGUMENT.................................................................................12

       A.    CreAgri Cannot Show That OLIVENOL Was In Lawful Use In Commerce Prior
             To June 18, 2002 (Or At Any Time)...............................................14

       B.    CreAgri Cannot Show That OLIVENOL Acquired Secondary Meaning Before
             June 18, 2002 ........................................................................19

       C.    Even If OLIVENOL Is A Valid Senior Mark, CreAgri Cannot Show Likely
             Confusion..............................................................................22

       D.    The Same Undisputed Facts Compel Summary For USANA On All The Parties'
             Claims ................................................................................23

IV.    CONCLUSION.............................................................................24

-i-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v2

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ............................................... 14

4

*Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440 (9th Cir. 1980) ........... 13

5

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979) ................................................ 3, 13, 22

6

*Barnes Group Inc. v. Connell Ltd. Partnership,* 793 F. Supp. 1277 (D. Del. 1992) .................. 23

7

*Buti v. Impressa Perosa, SA*, 935 F. Supp. 458 (S.D.N.Y. 1996), *aff'd*, 139 F.3d 98 (2d Cir.); *cert*

8

   *denied*, 525 U.S. 826 (1998) ..................................................................................... 14

9

*Canfield Co. v. Honickman*, 808 F. 2d 291 (3rd Cir. 1986) ...................................................... 2, 20

10

*Clairol Inc. v. Holland Hall Products, Inc.,* 165 U.S.P.Q. 214 (T.T.A.B. 1970) ........................ 17

11

*Clorox Co. v. Armour-Dial, Inc.,* 214 U.S.P.Q. 850 (T.T.A.B. 1982) ................................... 16, 17

12

*Coahoma Chemical Co., Inc. v. Smith*, 113 U.S.P.Q. 413 (Comr. 1957) ................................... 17

13

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) ................................ 21

14

*Commerce Bancorp., Inc. v. Bankatlantic*, 285 F. Supp. 2d 475 (D. N.J. 2003) ............... 2, 13, 19

15

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F. 3d 432 (3rd Cir. 2000) . 2,

16

   21

17

*Computerland Corp. v. Microland Computer Corp.*, 586 F. Supp. 22 (N.D. Cal. 1984) ............. 21

18

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ........................... 13

19

*Erva Pharmaceuticals, Inc. v. American Cyanamid Co.*, 755 F. Supp. 36 (D. P.R. 1991) ... 12, 13,

20

   16, 18

21

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143 (9th Cir. 1999) . 21

22

*Florida Breckenridge, Inc. v. Solvay Pharmaceuticals, Inc.*, 174 F.3d 1227 (11th Cir. 1999) ..... 16

23

*Geraghty Dyno-Tune v. Clayton Manufacturing Co.*, 190 U.S.P.Q. 508 (T.T.A.B. 1976) .......... 17

24

*In Re Medical Disposables Co.*, 25 U.S.P.Q. 2d 1801 (T.T.A.B. 1992) ...................................... 20

25

*In re Stellar International, Inc.*, 159 U.S.P.Q. 48 (T.T.A.B. 1968) .............................................. 18

26

*Japan Telecom, Inc. v. Japan Telecom America*, Inc., 287 F.3d 866 (9th Cir. 2002)  12, 20, 21, 22

27

-ii-

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

*Kellogg Company v. New Generation Foods, Inc.*, 6 U.S.P.Q. 2d 2045 (T.T.A.B. 1988) ........... 18

*Kenner Product Toys v. Rose Art Industries, Inc.*, 963 F.2d 350 (9th Cir.), *cert. denied*, 506 U.S. 862 (1992) ........................................................................................................................... 13

*Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.*, 53 U.S.P.Q. 2d 1406 (1999) ......... 2, 12, 20

*Nutri/System, Inc. v.Con-Stan Industries, Inc.*, 809 F.2d 601 (9th Cir. 1987) .............................. 13

*PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, (2d Cir. 1990) .................................... 20

*Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335 (D.N.J. 2002) ................................ 23

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902 (9th Cir. 1995) ...................................................................................................................................... 20, 22

*The Murphy Bed Company v. Interior Sleep Systems, Inc.*, 874 F.2d. 95 (2nd Cir. 1989) ........... 14

*Worthington Foods, Inc. v. Kellogg Co.,* 732 F. Supp. 1417 (S.D. Ohio 1990) ........................... 22

**Statutes**

15 U.S.C. § 1057(c) ........................................................................................................................ 6

15 U.S.C. § 1094 .......................................................................................................................... 12

21 C.F.R. § 101.36(f)(1) ............................................................................................................... 15

21 C.F.R. § 101.9(g)(1) through (g)(8) ............................................................................. 13, 15, 16


**Other Authorities**

Richard L. Kirkpatrick, Likelihood of Confusion in Trademark Law, § 1.8.c, at 1-45 (PLI 1995) ......................................................................................................................................................... 23

**Treatises**

McCarthy on Trademarks and Unfair Competition (McCarthy) (4th Ed.) ................. 1, 2, 7, 19, 20

I.

**PRELIMINARY STATEMENT**

Defendant and counterclaimant USANA Health Sciences, Inc. seeks summary judgment on all plaintiff and counter-defendant CreAgri, Inc.'s claims and on its own counter-claims.  USANA is entitled to judgment because CreAgri cannot prove that it owns a valid, protectable trademark senior to USANA's "Olivol" trademark.

In the typical trademark infringement case, the plaintiff has the senior, presumptively valid mark by virtue of a prior registration on the Principal Register of the Patent and Trademark Office.  The undisputed facts of this case are otherwise.  Defendant USANA's "Olivol" trademark has obtained a priority date of June 18, 2002 on the Principal Register from the PTO.  By contrast, plaintiff CreAgri's "OLIVENOL" is not a registered trademark.[1]  Before CreAgri can even claim infringement, therefore, it has to prove lawful use in commerce of its mark prior to June 18, 2002, and it cannot.  CreAgri also has to prove that its mark obtained secondary meaning prior to June 18, 2002, and it cannot.  Even if CreAgri cleared these threshold burdens, it would have to meet its burden of showing likely confusion under *Sleekcraft*, and the required evidence is simply missing.

Because the PTO determined that CreAgri's "OLIVENOL" is a "deceptively misdescriptive" mark, "OLIVENOL" is registered instead on the Supplemental Register, as of February 2003.  It is therefore not considered a trademark at all but only given the opportunity of someday trying to prove in federal court that it is in lawful use in commerce and that it has obtained secondary meaning.[2]  As a mark on the Supplemental Register, CreAgri's mark does

---

[1] "OLIVENOL" is spelled throughout this brief with block capitals because that is the way the name appears on CreAgri's products.  USANA's trademark, registered both as a word mark and a stylized logo, appears on products without block capitals, or as the stylized logo, which also is not block capitals.

[2] *See* 3 McCarthy on Trademarks and Unfair Competition (McCarthy) (4th Ed.) § 19:37 at 19-131: "A word, symbol, or device on the Supplemental Regisgter is not, strictly speaking, a 'mark.' That is, it is not registrable on the Principal Register and is only considered 'capable' of someday

-1-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1   not benefit from any presumption of validity. [3]  CreAgri therefore bears the burden of proving

2   that its OLIVENOL mark was in lawful use in commerce <u>and</u> that it had obtained secondary

3   meaning, all before June 18, 2002.[4]  It cannot do so.

4             First, CreAgri cannot show that its OLIVENOL product is now or ever has been

5   in lawful use in commerce.  It cannot because the OLIVENOL product is and at all times has

6   been in violation of the Food, Drug and Cosmetic Act ("FDCA").  The FDCA and its regulations

7   require that the labels for products such as OLIVENOL list their active ingredients, or nutrients,

8   and accurately state the amount of the ingredients in the product.  OLIVENOL has one active

9   ingredient or nutrient, hydroxytyrosol.  From the time that it was launched until sometime in

10  2002, OLIVENOL's label declared that each tablet contained 25 mg of hydroxytyrosol.  CreAgri

11  admits that its testing shows that the product contained then and contains now about 10% of that

12  amount – between 2.5 and 3 mg of hydroxytyrosol.  Sometime in 2002, CreAgri issued a new

13  label, claiming instead 5 mg of hydroxytyrosol.  CreAgri admits that its testing shows that all its

14  OLIVENOL products in fact still contain only about half of the amount claimed on its label.

15  Third party testing shows that the actual hydroxytyrosol content of the OLIVENOL tablets is only

16  1.7 to 2.4 mg.  This is a per se violation of the FDCA.  The courts and the Trademark Trial and

17

18  becoming a 'mark' upon the acquisition of secondary meaning."  As McCarthy also points out,
19  "registration on the Supplemental Register implies that secondary meaning cannot be shown."
    *Id.* at 19-132.
20  [3] "Because a mark not registered on the Principal Register has no presumption of validity or legal
21  protectability, [plaintiff] Novartis bears the burden to prove that [its mark] softchews is
    descriptive and has acquired some secondary meaning or that it is suggestive."  *Novartis*
22  *Consumer Health, Inc. v. McNeil-PPC, Inc.*, 53 U.S.P.Q. 2d 1406, 1411(1999) (granting
    summary judgment to defendant), *citing Canfield Co. v. Honickman*, 808 F. 2d 291, 297 (3rd Cir.
23  1986).
24  [4] *See Commerce Bancorp., Inc. v. Bankatlantic*, 285 F. Supp. 2d 475, 485 (D. N.J. 2003), *quoting*
    *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F. 3d 432, 438 (3rd Cir.
25  2000) ("'plaintiff must establish secondary meaning in a mark at the time and place that the
    defendant began use of the mark'").  Priority depends on "whether the plaintiff can prove by a
26  preponderance of the evidence that his mark possessed secondary meaning at the time defendant
    commenced use of his mark."  *Id.*
27
                                              -2-
28
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

Appeals Board have consistently held that such unlawful use cannot give rise to any trademark rights.

Second, even if CreAgri could show lawful use in commerce before June 18, 2002, it would then have to show that OLIVENOL had obtained secondary meaning, also before June 18, 2002.  It cannot.  Under penalty of perjury, CreAgri represented to the PTO that OLIVENOL means "olive oil" in German.  Declaration of James Wesley Kinnear in Support of Motion for Summary Judgment (Kinnear Decl.), ¶ 4; Exh. D (OLVENOL PTO file history, USA005070 – 5105) at USA005075 – USA005076.  The PTO therefore ruled that the mark was not merely descriptive but even worse, "deceptively misdescriptive," because it contains no olive oil.  By its own admissions, before June 18, 2002, CreAgri sold very little if any OLIVENOL, did little or no advertising or public relations work, and otherwise did little or nothing to establish secondary meaning in the minds of consumers.

Finally, even if CreAgri could clear these two threshold obstacles, it cannot make out likelihood of confusion under *Sleekcraft*.  If it is a protectable trademark at all, it is a very weak mark entitled to the thinnest protection.  There is no showing of actual or likely confusion.

These same undisputed facts dictate the result on all the parties' claims.  The Court should grant summary judgment for USANA, leaving only the scope of relief for further proceedings.

## II.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.  The Companies And Their Products**

USANA develops and markets vitamins, food supplements and health products.  Its research resulted in two issued patents owned by USANA relevant to the products at issue here.  USANA licenses those patents to an Italian company, which produces the extract for USANA.  The extract produced by these patented processes is known as the Olivol ingredient.  Declaration of John Cuomo in Support of Motion for Summary Judgment (Cuomo Decl.), ¶ 6.

-3-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

The Olivol ingredient is found in a number of USANA's products, including USANA's Mega Antioxidant.  USANA packages Mega Antioxidant with its Chelated Mineral product for its Essentials product.  Health Pak 100 provides multiple supplements packaged in daily doses (morning and evening); one of the supplements is Mega Antioxidant.[5]  The Olivol ingredient is also found in USANA's Body Rox.[6]  USANA also sells its Mega Antioxidant packaged in the Essentials product with a bottle of its Cheleated Mineral product, which itself contains over thirteen ingredients.  The Olivol ingredient itself has multiple components, including tyrosol, hydroxytyrosol, sugar conjugates of both tyrosol and hydroxytyrosol, verbascoside, and numerous other minor compenents.  It contains the phenolic compounds found in olives, in the same ratio as found in nature.  Cuomo Decl., ¶ 9.

By contrast, CreAgri's OLIVENOL product is a stand-alone product sold in tablet, capsules and liquid form with one active ingredient:  hydroxytyrosol.  CreAgri originally offered only a tablet form of OLIVENOL.  Beginning some time in 2002, CreAgri also began offering capsules and liquid products.  Kinnear Decl.; Exh. A (Crea Depo. 42:4-13; 77:15-20).  The branded ingredient used in the OLIVENOL product is not called "OLIVENOL" but rather "HIDROX," a trademark not at issue in this litigation.  HIDROX is CreAgri's olive water extract containing hydroxytyrosol, which it uses as an ingredient in its various OLIVENOL products.  Kinnear Decl.; Exh. A (Crea Depo. 27:3-11; 29:2-4; 30:25 – 31:1).

---

[5] Mega Antioxidant has many ingredients.  In addition to the Olivol ingredient, Mega Antioxidant contains:  Vitamin A, C, D, E, K, B6, B12, Thiamin, Riboflavin, Niacin, Folate, Biotin, Pantothenic Acid, Bioflavonoid Complex, Inositol, Choline Bitartrate, N-Acetyl L-Cysteine, Bromelain, Alpha Lipoic Acid, Coenzyme Q10, Glutathione, Turmeric Extract, Lutein, Lycopene, Broccoli Concentrate, Microcrystalline Cellulose, Pregelatinized Starch, Croscarmellose Sodium, Ascorbyl Palmitate, Dextrin, Collodial Silicon Dioxide, and Dextrose.
[6] Body Rox also contains Vitamin A, C, D, E, K, B6, B12, Thiamin, Riboflavin, Niacin, Folate, Biotin, Pantothenic Acid, Antioxidant Phytonutrient Complex (including the Olivol ingredient), Inositol, Choline Bitartrate, N-Acetyl L-Cysteine, Lutein, Lycopene, Broccoli Concentrate, Calcium, Iodine, Manganese, Chromium, Molybdenum, Vanadium, Boron, Silicon, Ultra Trace Minerals, Microcrystalline Cellulose, Pregelatinized Starch, Croscarmellose Sodium, Ascorbyl Palmitate, Dextrin, Collodial Silicon Dioxide, and Dextrose.

-4-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

USANA sells all of its products through a network marketing system – similar to the systems of well-known Avon, MaryKay, Tupperware and Shaklee.  The distributors of its products are "Independent Associates," of which there are over 50,000 in the United States.  The distributors educate and sell products to consumers in intimate gatherings or on an individual basis.  They communicate directly with USANA; USANA does not advertise to the general public in published media.  Cuomo Decl., ¶ 11.

CreAgri offers its OLIVENOL product at retail outlets and Web sites.

USANA's products are sold at different prices from CreAgri's OLIVENOL.  A month's supply of Essentials retails for $53.30; Mega AO for $18.00; Body Rox for $23.87; HealthPak 100 for $142.70.  Cuomo Decl., ¶ 13.

CreAgri's OLIVENOL sells for approximately $20.00 for a month's supply.

**B. USANA's Olivol Trademark Has A Priority Date Of June 18, 2002 On The Principal Register**

USANA filed Intent to Use applications for the Olivol mark and stylized Olivol mark on June 18, 2002.  The application was filed for use with an olive extract polyphenolic complex used as an ingredient in vitamins, minerals and nutritional supplements.  The marks were published for opposition on December 24, 2002.  A Notice of Allowance was issued on March 18, 2003 for each of the marks.  USANA filed a Statement of Use on May 2, 2003 claiming first use in commerce of August 29, 2002.  Kinnear Decl., ¶ 7; Exh. G (Certificates of Registration and June 18, 2002 Intent to Use Applications for USANA'S "Olivol" word mark and stylized mark) (USA004125 – USA004128, USA005025 – USA005030, USA004162 – USA004167, USA005049 – USA005051).  CreAgri filed a letter of protest with the PTO on July 15, 2003, claiming as it does here that the marks are confusingly similar.  Kinnear Decl., ¶ 3; Exh. C (CREAG15545 – CREAG15547).  Nonetheless, over CreAgri's objection, the PTO registered the Olivol trademarks on November 11, 2003.  As a result, USANA's priority date is

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

June 18, 2002, the date it filed its intent to use application.[7]  Kinnear Decl., ¶ 7; Exh. G (USANA Trademark Registration Certificates and Intent to Use Applications). .

**C.  CreAgri's OLIVENOL Tradename Is Not A Registered Trademark; It Is A "Deceptively Misdescriptive" Mark Registered Only On The Supplemental Register**

CreAgri filed a trademark application in the PTO on January 4, 2002 to seek registration of the OLIVENOL mark.  Kinnear Decl., ¶ 4; Exh. D (OLIVENOL PTO File History, USA005070 – USA005105) at USA005070, USA005075-USA005077.  Under penalty of perjury, Dr. Roberto Crea, CreAgri's founder and president, represented in the application that OLIVENOL means "olive oil" in German. Kinnear Decl., ¶ 4; Exh. D (OLIVENOL PTO File History, USA005070 – USA005105) at USA005075-USA005077.  The PTO confirmed the translation of the mark by enclosing a copy of the definition of "OLIVENOL" from a German dictionary.  Kinnear Decl., ¶ 5; Exh. E (PTO Office Action, CREAG00376 – CREAG00393). The PTO refused registration of the mark on the Principal Register because the mark is deceptively misdescriptive of the goods.  *Id.* at CREAG00376-CREAG00377.  The PTO noted that CreAgri sought registration of the mark for a dietary supplement.  *Id.* at CREAG00377.  The PTO found evidence that olive oil and its byproducts are common ingredients in dietary supplements.  Further, it found that olives and olive oil are commonly recognized for their health benefits.  *Id.* at CREAG00376-CREAG0000393.  Thus, the PTO concluded that consumers are likely to purchase the OLIVENOL products based on a belief that olive oil is a characteristic or feature of the goods, which in fact it is not.  *Id.* at CREAG00377.  OLIVENOL contains no olive oil and is not extracted from olive oil.  Kinnear Decl.; Exh. A (Crea Depo. 27: 3-11; 27: 20-25; 75: 9-13).

In response to the rejection, CreAgri amended its application to seek registration of OLIVENOL on the Supplemental Register.  Kinnear Decl., ¶ 4; Exh. D (OLIVENOL PTO File History, USA005070 – USA005105)  at USA005099.  (CreAgri could have changed the

---

[7] 15 U.S.C. § 1057(c).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

tradename at this point, and chosen a name that did not mean "olive oil," and was not deceptively misdescriptive, but it chose not to do so.)  The registration of the mark on the Supplemental Register was granted on February 4, 2003, seven months after USANA's priority date.  Kinnear Decl., ¶ 4; Exh. D (OLIVENOL PTO File History, USA005070 – USA005105)  at USA005073.  The mark has not been registered on the Principal Register.  Registered only on the Supplemental Register, OLIVENOL is classed not as a trademark but as a mark capable of becoming a trademark if and when it attains secondary meaning. [8]

**D.  CreAgri's OLIVENOL Contains Only A Fraction Of The Sole Nutrient Claimed On Its Label, And It Contains No Olive Oil.**

OLIVENOL is a dietary supplement, sometimes referred to as a "nutraceutical." Cuomo Decl., ¶ 10; Kinnear Decl.; Exh. A (Crea Depo. 30: 14-17).  It has one active ingredient or nutrient, hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea Depo. 29: 2-4; 30: 25 – 31: 1). CreAgri claims that it first used the mark in commerce by selling OLIVENOL tablets in March 2001.  (CreAgri Complaint, ¶ 9.)  The label at that time claimed that each tablet of OLIVENOL contained 25 mg of hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea Depo. 52: 9-18).  CreAgri admits that this claim was false.  Kinnear Decl.; Exh. A (Crea Depo. 52: 9-18; 53: 16-23; 54: 1- 15; 66: 10-19).  CreAgri admits that it was alerted to the falsity of the claim, and confirmed the falsity of the claim, during 2001, but it is vague about exactly when or how it learned of its error. *Id.* and Kinnear Decl.; Exh. A (Crea Depo. 56: 18 – 57: 2; 57: 13 – 60: 9).  According to CreAgri's testing, however, from the start to the present day the OLIVENOL products contained somewhere between 2.5 and 3 mg of hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea Depo 69: 7- 18; 74: 7-10; 83: 17 – 84: 14; 85: 3-17).

---

[8] *See* 3 McCarthy § 19:37 at 19-131.  As McCarthy also points out:  "There is nothing in amended §27 to preclude Supplemental Registration from being deemed an admission against interest that the term is not inherently distinctive."  3 McCarthy § 19:35 at 19-127 & fn. 4.

#8805 v1

CreAgri testified that the 2002 OLIVENOL tablets, capsules, and drops contained about 50% of

the hydroxytyrosol shown on the 5 mg label:

> "Q:  Have you gone back and used the current protocols that you're doing now, the two protocols, to test batches from 2002.
>
> A:  I believe that we did.
>
> Q:  Okay.  And when you tested those batches from 2002 using your testing methods of today, did you have the same results that you describe which is that you have roughly 50 percent of the Hydroxytyrosol that you thought you had?
>
> A:  Yes."

Kinnear Decl.; Exh. A (Crea Depo. 85: 3-12).

Even after CreAgri learned of the falsity of the claim on its labels, CreAgri did

not recall the product.  It did not notify anyone that the label was in error – not distributors, not

retailers, not the FDA, not consumers, no one.  Kinnear Decl.; Exh. A (Crea Depo. 86: 4 – 14).

According to Dr. Crea, CreAgri's founder and designated most knowledgable witness on the

subject, CreAgri sold so little of the product in 2001 and into 2002, it did not matter.  According

to Dr. Crea, these were not really sales – more like introductory promotions.  Kinnear Decl.;

Exh. A (Crea Depo. 73: 15 – 21; 85: 25 – 86: 10).

Instead, sometime in 2002 – again CreAgri is vague – CreAgri changed producers

for its OLIVENOL product, and changed its labels.  Kinnear Decl.; Exh. A (Crea Depo. 76: 25 –

77: 5).  CreAgri for the first time offered not only a tablet OLIVENOL but also capsules and a

liquid drop form of OLIVENOL.  Kinnear Decl.; Exh. A (Crea Depo. 42: 4 – 13; 54: 5 – 13; 77:

15 – 20).  According to CreAgri, these new-labeled tablets, capsules, and drops were all first

offered for sale at the same time.  *Id.*  The labels now claimed that each tablet, each capsule, and

each dose of drops, contained 5 mg of the touted hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea

Depo. 64: 7 – 17); Kinnear Decl.; Exh. H (CREAG 2308, 2309, 2310).  This claim was also

false.  CreAgri admits that its testing shows that in 2002 the product in fact contained about half

the claimed amount, between 2.5 and 3 mg of hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea

Depo. 69: 7-18; 74: 7-10; 83:16 – 84: 14; 85: 3-17).  And tests by USANA and a third party

-8-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1  show that the hydroxytyrosol content was even lower, 1.7 to 2.4 mg.  Cuomo Decl., ¶¶ 16-21,

2  23; Exhs. B and C.  The 2002 OLIVENOL products all contained the same amount of

3  hydroxytyrosol as the 2001 products, although different forms of HIDROX were used to make

4  some of them.  Kinnear Decl.; Exh. A (Crea Depo. 69: 7 – 18; 111: 22 – 25; 115: 5 – 14).

5          CreAgri has also testified that OLIVENOL is derived from olive waste water, not

6  olive oil.  Although OLIVENOL may contain a very small amount of fatty acids found in olive

7  oil, it does not contain olive oil itself.  Kinnear Decl.; Exh. A (Crea Depo. 27: 20 – 25; 75: 9 –

8  13).

9  **E.  CreAgri Sold Almost No OLIVENOL Before June 18, 2002**

10         CreAgri testified that it sold very little OLIVENOL until it offered the new-

11 labeled tablets, capsules, and drops in 2002.  Kinnear Decl.; Exh. A (Crea Depo.:  86: 1-9).

12 CreAgri is vague about when it terminated its original producer of OLIVENOL (Adam

13 Nutrition), however, which made the product sold with the 25 mg label, and when in 2002 it

14 began to sell OLIVENOL produced by its new producer, Protein Research, with the new 5 mg

15 label.  Kinnear Decl.; Exh. A (Crea Depo. 47: 11 - 20; 52: 9 – 18; 53: 4 – 9; 54: 1- 15).

16 Nonetheless, the documents and testimony indicate that the new (and still false) 5 mg label did

17 not go on the market until June 2002 or later.  A March 18, 2002, email from CreAgri's

18 marketing consultant to CreAgri states that the "new tablets" would take up to 12 weeks to

19 produce.  Kinnear Decl., ¶ 9; Exh. I (CREAG 11602).  According to Dr. Crea, the "new tablets"

20 in this email are the tablets produced by Protein Research with the new 5 mg label.  Kinnear

21 Decl.; Exh. A (Crea Depo., 112: 17 – 23).  Twelve weeks from March 18, 2002, is June 10,

22 2002.  Similarly, on March 6, 2002, CreAgri wrote to another potential producer for the

23 OLIVENOL to replace Adam Nutrition to say that CreAgri had decided to hold off producing

24 OLIVENOL until "CreAgri, Inc. can secure the proper validation documentation of

25 hydroxytyrosol."  CreAgri states in the letter that it believes that this will take at least 90 to 120

26 days to achieve.  Kinnear Decl., ¶ 10; Exh. J (CREAG 11595).  Ninety to 120 days from March

27

28

#8805 v1

6, 2002, is somewhere between June 4 and July 4, 2002.  According to CreAgri's witness most knowledgeable, this letter shows that CreAgri did not yet have the necessary data to support the amount of hydroxytyrosol in its tables.  Kinnear Decl.; Exh. A (Crea Depo. 119: 1-3).  CreAgri also testified that it could not create the OLIVENOL product until it had the data referenced in the March 6, 2002 letter – data that would require 90 to 120 days to acquire.  Kinnear Decl.; Exh. A (Crea Depo.: 119: 23-25).

Other CreAgri documents indicate that the new-labeled tablets, capsules and drops did not go on sale to the public until after June 18, 2002, so that noticeable sales of OLIVENOL could not commence until well after that date as well.  According to CreAgri's documents, the labels for the OLIVENOL capsules were not even delivered to CreAgri until June 21, 2002, and were not scheduled to be shipped to Protein Research until the week of June 24, 2002.  Kinnear Decl.; Exh. K (CREAG 11731 and CREAG 11659).  Labels for either the capsules or the liquid were not available until July 25 or 26, 2002.  Kinnear Decl., ¶ 12; Exh. L (CREAG 11663).  The documents therefore indicate that the new-labeled capsules, tablets, and drops were not ready for sale to the public until July 2002.  According to CreAgri, it sold almost none of the OLIVENOL with the 25 mg label, and the new 5 mg labeled (and still false) product was not sold to the public before July 2002.

At least since 2001, CreAgri also makes and sells a bulk form of its nutraceutical extract containing hydroxytyrosol under the mark HIDROX.  The HIDROX mark is not at issue in this litigation.  CreAgri has testified that its marketing and sales efforts are focused on HIDROX, not on OLIVENOL.  Most of CreAgri's sales and revenues are attributable to HIDROX, not OLIVENOL.  Kinnear Decl.; Exh. A (Crea Depo.: 37: 23 – 38: 4; 40: 21 – 23) CreAgri also produces and sells olive oil under the SUPREMO mark, and it sells bulk olive oil to other packers.  Kinnear Decl.; Exh. A (Crea Depo. 16: 11 – 22)

**F.  CreAgri Had Done Almost Nothing To Establish Secondary Meaning In OLIVENOL Before June 18, 2002**

-10-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1    CreAgri admits that it sold almost no OLIVENOL – a few boxes as an

2    introductory promotion – before it introduced its new 5 mg hydroxytyrosol label in 2002.

3    Kinnear Decl.; Exh. A (Crea Depo.: 86: 1-9).  CreAgri has testified that in 2001 and 2002

4    OLIVENOL had no network for distribution.  Kinnear Decl.; Exh. A (Crea Depo.: 135:1-8).  Dr.

5    Crea explained futher:

6         "Q.  So in 2002, it was still a new product, unknown, basically, is that right?

7         "A:  Yes."

8    Kinnear Decl.; Exh. A (Crea Depo.:  135:8-11).

9    CreAgri's witness most knowledgable could not say when in 2002 CreAgri first

10   sold OLIVENOL with the new 5 mg labels, but he concedes that it was no earlier than March

11   2002.  Kinnear Decl.; Exh. A (Crea Depo. 117: 15 – 23).  As outlined above, the documents

12   indicate that the new labels, and therefore sales of OLIVENOL, did not begin until after June

13   2002.  For the purpose of evaluating sales to gauge secondary meaning, therefore, the relevant

14   sales of OLIVENOL are between March 2002, at the very earliest, and June 18, 2002, a period of

15   three and one-half months or less.  It even appears that sales of OLIVENOL with the new labels

16   began _after_ USANA's priority date of June 18, 2002, so that according to CreAgri's testimony,

17   noticeable sales of OLIVENOL did not even start until after USANA's priority date.

18   In any event, before June 18, 2002, OLIVENOL sales with any label were

19   negligible.  To the extent that CreAgri's financials reveal any sales of OLIVENOL, as opposed

20   to the nutraceutical HIDROX, sales of OLIVENOL continued to be minimal until well after June

21   2002.

22   Similarly, all marketing expenditures of any kind (CreAgri's financial documents

23   do not specify the purpose for which the expenditures are made) for CreAgri products, including

24   OLIVENOL, HIDROX, and SUPREMO, also continued to be very low until well after June

25   2002.  CreAgri claims to have conducted limited telemarketing (telephone calls to retailers) by

26

27                                        -11-

28

1   one employee and then another during 2002.  Kinnear Decl.; Exh. A (Crea Depo.: 140: 6 – 23)

2   The earliest dates shown in these calling records are September 2002.[9]

3           CreAgri has produced in discovery no advertisements for OLIVENOL prior to

4   June 2002, no press releases for OLIVENOL prior to June 2002, and no editorial content from

5   publications mentioning OLIVENOL prior to June 2002.  In fact, CreAgri terminated its

6   marketing director in 2002 and did not hire a replacement.  Those skills and that function were

7   relevant to OLIVENOL, but the company was focused on HIDROX and did not want a

8   marketing director anymore.  Kinnear Decl.; Exh. A (Crea Depo. 95: 18 – 96: 4).

9           There is no evidence of any actual consumer confusion of the OLIVENOL mark

10  at any time.

11          Finally, CreAgri has produced no direct evidence of secondary meaning of any

12  kind – no consumer surveys, no evidence of awareness of the OLIVENOL mark in the market,

13  nothing.  CreAgri testified that it considered doing such awareness studies at one point, but

14  decided that the first priority had to be finding distribution for the product.  Kinnear Decl.; Exh.

15  A (Crea Depo. 134: 17 – 135: 10).

16                                          **III.**

17                                      **ARGUMENT**

18          To prove infringement, and to establish any of its claims, CreAgri has the burden

19  of proving first that it owns a valid, protectable mark senior to USANA'S trademark registered

20  on the Principal Register.  *See Japan Telecom, Inc. v. Japan Telecom America*, Inc., 287 F.3d

21  866, 872 (9th Cir. 2002).  As a mark on the Supplemental Register, OLIVENOL is not entitled to

22  any presumption of validity.  15 U.S.C. § 1094; See also *Novartis*, 53 U.S.P.Q.2d at 1411.

23  CreAgri therefore has the burden of proving lawful use in commerce prior to June 18, 2002.  *See*

24

25  [9]Kinnear Decl., ¶ 13; Exh. M (Call Leads telephone list).  Handwritten notes on this telephone
    list of retailers show the earliest dates in September, without a year.  CreAgri testified that the
26  calling of retailers on the list did not begin until 2002, however.  Kinnear Decl.; Exh. A (Crea
    Depo. 140: 6 – 23).
27

28                                          -12-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

*Erva Pharmaceuticals, Inc. v. American Cyanamid Co.*, 755 F.Supp 36, 39-40 (D. P.R. 1991). CreAgri then has the burden of proving that OLIVENOL acquired secondary meaning before June 18, 2002. *Commerce Bancorp., Inc.*, 285 F. Supp.2d at 485. As the recitation of undisputed facts demonstrates, CreAgri cannot do so.

Even if CreAgri could pass these two thresholds, it would then have the burden of proving likelihood of confusion. In the Ninth Circuit, the courts evaluate claims for infringement under the familiar *Sleekcraft* factors: (1) strength of the marks; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care to be exercised by consumers; and (7) defendant's intent in selecting the mark. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979). Not all factors are relevant in every case. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). CreAgri cannot show likely confusion. By definition as a "deceptively misdescriptive" mark, OLIVENOL is a very weak mark entitled to the thinnest protection if it is a valid mark at all. *See Kenner Product Toys v. Rose Art Industries, Inc.*, 963 F.2d 350, 353 (9th Cir.), cert. denied, 506 U.S. 862 (1992) ("a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark"; "[t]hus, the Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark"); *Nutri/System, Inc. v.Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987) (affirming summary judgment for defendant) (descriptive mark is a weak mark; "In order to receive protection, the holder of a descriptive mark must demonstrate "secondary meaning," that is, show that an association between the mark and the product has been established in the consumers' minds"); *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 446 (9th Cir. 1980) ("if the mark is weak, then a stronger showing as to other factors (overlap of goods, actual confusion, etc.) must be made").

-13-

Merely colorable evidence will not avoid summary judgment; rather, the nonmoving party must introduce some "significant probative evidence tending to support the complaint." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**A. CreAgri Cannot Show That OLIVENOL Was In Lawful Use In Commerce Prior To June 18, 2002 (Or At Any Time)**

From their entry into the market, the OLIVENOL products have violated the Food, Drug and Cosmetic Act ("FDCA") and therefore have not been in lawful use in commerce.

Under the FDCA, it is illegal to misbrand any food in interstate commerce. 21 U.S.C. § 331(a) and (b). "Food" is defined as "(1) articles used for food or drink for man or other animals, … and (3) articles used for components of any such article." 21 U.S.C. § 321(f). "Dietary supplements" such as OLIVENOL are deemed to be food. 21 U.S.C. § 321(ff). The FDCA provides that a food "shall be deemed misbranded … [i]f (1) its labeling is false or misleading in any particular …." 21 U.S.C. § 343(a)(1). CreAgri's OLIVENOL products contain no olive oil, nor are they derived from olive oil.[10] As CreAgri represented in its application to the PTO, "OLIVENOL" means "olive oil." CreAgri's OLIVENOL products violate the FDCA through the very use of the OLIVENOL name. Indeed, the PTO found the OLIVENOL mark to be deceptively misdescriptive, and that is the reason the PTO denied its registration on the Principal Register. The PTO concluded that consumers are likely to purchase the OLIVENOL products on a belief that olive oil is a characteristic or feature of the goods, which in fact it is not. *See The Murphy Bed Company v. Interior Sleep Systems, Inc.*, 874 F.2d. 95, 101 (2nd Cir. 1989) (PTO and T.T.A.B. decisions entitled to deference); *Buti v. Impressa Perosa, SA*, 935 F. Supp. 458, 460 n.2 (S.D.N.Y. 1996), aff'd. 139 F.3d 98 (2d Cir.); cert denied 525 U.S. (1998) (decisions of the T.T.A.B. entitled to "great weight").

---

[10] CreAgri has testified that OLIVENOL is derived from olive waste water, not olive oil. Although OLIVENOL may contain a very small amount of fatty acids found in olive oil, it does not contain olive oil itself. Kinnear Decl.; Exh. A (Crea Depo. 27: 20 – 25; 75: 9 – 13).

-14-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1    But that is not the only way that the OLIVENOL products violate the FDCA.

2  Regulations promulgated by the FDA pursuant to the FDCA provide the labeling requirements

3  for dietary supplements.  *See* 21 C.F.R. §101.36.  The requirements specifically addressing

4  dietary supplement labeling reference another, more general, regulation mandating the labeling

5  requirements for nutrients found in food.  *See* 21 C.F.R. § 101.36(f)(1) referencing 21 C.F.R. §

6  101.9(g)(1) through (g)(8).  For "Class I" nutrients, defined as "[a]dded nutrients in fortified or

7  fabricated foods" (21 C.F.R. § 101.9(g)(3)(i)), the label is misbranded unless it states the

8  "nutrient content of the composite … at least equal to the value for that nutrient declared on the

9  label." 21 C.F.R. § 101.9(g)(4)(i).  CreAgri's OLIVENOL products are fabricated foods that are

10  fortified with hydroxytyrosol.  Their labels must state the amount of hydroxytyrosol in the

11  products, and that stated amount must be at least equal to the amount of hydroxytyrosol that is in

12  the products.

13    At no time have CreAgri's labels for its OLIVENOL products met the FDCA's

14  legal standard, or even come close.  When the tablet form product was first introduced, its label

15  stated that it contained 25 mg of hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea 52:3-15)  By

16  CreAgri's own admission, that claim grossly overstated the amount of hydroxytyrosol in the

17  OLIVENOL tablet, by <u>an approximate factor of ten</u>.  CreAgri admits now that the product

18  contains less than 3 mg of hydroxytyrosol.  Sometime in 2002, CreAgri "corrected" the label on

19  the tablet form of OLIVENOL when it also introduced the capsule and liquid products for the

20  first time.  Kinnear Decl.; Exh. A (Crea 54:5-15)  Now the labels all state that the amount of

21  hydroxytyrosol in the OLIVENOL products is 5 mg.  (*Id*.)  That, however, is also false and

22  CreAgri knows it:  their own testing shows that OLIVENOL product contain only 2.5 to 3 mg of

23  hydroxytyrosol.  Kinnear Decl.; Exh. A (Crea 83:5-84:14)  Laboratory testing of the OLIVENOL

24

25

26

27

28

-15-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

tablets show even lower levels of hydroxytyrosol, only 1.7 to 2.4 mg.  Cuomo Decl., ¶¶ 16-21, 23; Exhs. B and C.  The OLIVENOL labels unquestionably violate the FDCA.[11]

The gross discrepancy between the amounts claimed on the labels and the amount actually contained in the products is especially striking, because CreAgri touts the OLIVENOL product largely based on its claimed high concentrations of hydroxytyrosol.  Dr. Crea testified:

> "When we first started, we made a very clear differentiation between our product and any other olive formulation, including olive leaf products, because our OLIVENOL was the first and only product that contained substantial quantity of hydroxytyrosol.  No product in the market that is promoted as olive leaf contains high concentration of hydroxytyrosol."  Crea 87:17-23.[12]

OLIVENOL's violation of the FDCA means that it has not been in lawful use in commerce and therefore is not entitled to any trademark rights at all.  The Eleventh Circuit summarized the law on the subject in *Florida Breckenridge, Inc. v. Solvay Pharmaceuticals, Inc.*, 174 F.3d 1227, 1232 (11th Cir. 1999):

> "[T]he Lanham Act only protects parties engaged in lawful commerce.  *Erva Pharmaceuticals, Inc. v. American Cyanamid Co.*, 755 F. Supp. 36, 39-40 (D. P.R. 1991) (applying federal trademark law to equivalent state unfair competition statute and holding that party who shipped pharmaceuticals in violation of the FDCA did not have standing to sue for trademark infringement); *Clorox Co. v.*

---

[11] Even under the less stringent standards for Class II nutrients, defined as "naturally occurring (indigenous) nutrients" (21 C.F.R § 101.9(g)(3)(ii)), the stated amount of the nutrient on the product label must be at least equal to 80% of the amount of the nutrient in the product, as long as that comports with the generally recognized variability for the analytical method used to determine the amount of that nutrient in foods.  21 C.F.R. § 101.9(4)(ii).  Here, neither CreAgri's findings on the amount of hydroxytyrosol in the OLIVENOL products, nor the third party laboratory results, provide evidence that the products actually contain even 80% of the amount of hydroxytyrosol the labels claim they do.  And the generally recognized variability for the analytical method (High Pressure Liquid Composition test or HPLC) used to determine the amount of hydroxytyrosol a product contains is 2-3%.  (Cuomo Decl., ¶¶18, 25)  Whatever labeling standard applies, the OLIVENOL products' labels violate it by a wide margin.

[12] See Kinnear Decl.; Exh. F (CREAG09096), a magazine clipping from 2002 produced by CreAgri quotes a nutrionist as saying, "[i]f this product has as much of [hydroxytyrosol] as it says, it could be helpful."  The clipping is headed "olive oil pills are worth a taste," proving the PTO was right in concluding the consumers would believe that OLIVENOL contains olive oil. We know that the clipping comes from 2002, because it refers to the liquid and capsule products, not offered until 2002.

-16-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

> *Armour-Dial, Inc.*, 214 U.S.P.Q. 850, 851 (T.T.A.B. 1982) ("It has been the consistent position of this board and the policy of the Patent and Trademark Office that a 'use in commerce' means a 'lawful use in commerce', and the shipment of goods in violation of federal statute, including the Food, Drug and Cosmetic Act, may not be recognized as the basis for establishing trademark rights.")  This fundamental rule predates the Lanham Act, and would apply to [plaintiff's] common law claims as well."[13]

*Geraghty Dyno-Tune v. Clayton Manufacturing Co.,* 190 U.S.P.Q. 508 (T.T.A.B. 1976), explains the same long-established principle:  "Since the pioneer case of *Coahoma Chemical Co., Inc. v. Smith*, 113 U.S.P.Q. 413 (Comr. 1957), [*citations omitted*], the Patent and Trademark Office has consistently held that the use of a mark in connection with unlawful shipments does not give rise to rights in the mark that may be recognized." *Id.*, at 512.  "Trademark rights, either at common law or under the Lanham Act, are acquired and maintained only by lawful use." *Id.*

The courts have repeatedly applied the principle summarized by the *Florida Breckenridge* court to deny trademark rights to marks used on products that violate the FDCA, as OLIVENOL does.  As approved by the Eleventh Circuit:

> "It has been the consistent position of this board and the policy of the Patent and Trademark Office that a 'use in commerce' means a 'lawful use in commerce', and the shipment of goods in violation of federal statute, including the Food, Drug and Cosmetic Act, may not be recognized as the basis for establishing trademark rights."

*Clorox Co. v. Armour-Dial, Inc.,* 214 U.S.P.Q. 850, 851 (T.T.A.B. 1982).  To the same effect is *Clairol Inc. v. Holland Hall Products, Inc.,* 165 U.S.P.Q. 214, 218 (T.T.A.B. 1970), where the Board found that Holland had violated the FDCA by shipping product without accurate label information.  The Board found that this use was an "'unlawful shipment' from which no registrable rights can arise since it did not comply with the labeling requirements of The Federal, Drug and Cosmetic Act [*sic*]." *Id.*, at 220.

---

[13] The Eleventh Circuit cites to decisions of the PTO's Trademark Trials and Appeals Board ("T.T.A.B."), and the courts have consistently acknowledged that decisions of the PTO and its T.T.A.B. are entitled to deference.

-17-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1    For example, in *Erva Pharmaceuticals, Inc. v. American Cyanamid Co.*, 755 F.

2  Supp. 36, 39-40 (D. P.R. 1991), approved in *Florida Breckenridge*, plaintiff violated the FDCA

3  by using the wrong type size on its labels and placing certain names in the wrong label position.

4  *Erva*, 755 F. Supp. at 40-41.  Based on these labeling errors, the court found the product to be in

5  *per se* violation of the FDCA, and therefore not in lawful use in commerce.  *Id.*, at 41.  Failing to

6  show lawful use, the plaintiff had no trademark rights and no standing to assert an infringement

7  claim.  *Id.*, at 40.  The court accordingly granted summary judgment to defendant.

8    As *Erva* and *Florida Breckenridge* make clear, a ruling by a court or agency of a

9  violation of the FDCA is not required to block a plaintiff's attempt to establish a valid trademark;

10  a *per se* violation of the statute or regulation is sufficient.  *See Kellogg Company v. New*

11  *Generation Foods, Inc.*, 6 U.S.P.Q. 2d 2045, 2047 (T.T.A.B. 1988) ("*per se* violation of a statute

12  regulating the sale of the party's goods" is sufficient to invalidate trademark).  In *Kellogg*, the

13  board found that Kellogg's shipments without the required label information were not in

14  violation of the FDCA, because they were shipments to research facilities for testing, not for

15  distribution to consumers.  *Id.*, at 2047-48.  In any event, *Kellogg* was not relying on the

16  shipments to research facilities to establish prior "use in commerce."  There is no question that

17  CreAgri's sales and distribution of OLIVENOL with false claims of hydroxytyrosol on its labels

18  (5 mg and 25 mg) were not shipments to research facilities, and they are the sole basis for

19  CreAgri's claim that it has acquired trademark rights by prior lawful use in commerce.  *In re*

20  *Stellar International, Inc.*, 159 U.S.P.Q. 48 (T.T.A.B. 1968) is also instructive.  In that case, the

21  T.T.A.B. ruled that Stellar had not acquired trademark rights.  Its use in commerce had been

22  unlawful because its labels had failed to include accurate content information in violation of the

23  FDCA.  *Id.*, at 51.  The T.T.A.B. rejected Stellar's argument that it was not in *per se* violation of

24  the statute because the FDCA provided limited exceptions for "small packages" and for

25  "reasonable variations."  *Id.*, at 52.

26

27    -18-

28

#8805 v1

CreAgri's violation is if anything more flagrant than the *Erva* plaintiff's.  It first misstated the amount of its only nutrient – 25 mg instead of approximately 2.5 mg – without notifying anybody and without recalling the product even after it confirmed the error.  It then issued new labels claiming approximately twice the actual amount of hydroxytyrosol – 5 mg instead of approximately 2.5 to 3 mg.  For this class of nutraceuticals (Class I), the FDA requires that the claimed amount be <u>equal to or greater</u> than the actual content.  CreAgri has not come close.

CreAgri's OLIVENOL violates the FDCA by its false label claims, both on the amount of hydroxytyrosol and its misleading reference to olive oil.  The same undisputed fact of CreAgri's unlawful use compel summary judgment on all CreAgri's claims, and for USANA on all its affirmative claims.  All its claims are predicated on its allegation that it owns a valid trademark prior to USANA's.  As demonstrated here, CreAgri can make no such showing, either of lawful use prior to June 18, 2002, or even at any time.

**B.  <u>CreAgri Cannot Show That OLIVENOL Acquired Secondary Meaning Before June 18, 2002</u>**

As holder of a "deceptively misdescriptive" mark on the Supplemental Register, CreAgri must prove that OLIVENOL acquired secondary meaning before June 18, 2002.  *See Commerce Bancorp., Inc.,* 285 F. Supp. 2d at 485.

The PTO found that OLIVENOL was a "deceptively misdescriptive" mark under the doctrine of "foreign equivalence."  *See* 2 McCarthy § 11:34 at 11-66–11-68.  That is, a foreign word will be evaluated as a trademark as if it were the English translation of that word.  *Id*.  CreAgri represented to the PTO that "OLIVENOL" means "olive oil" in the German language.  It then accepted registration on the Supplemental Register.  While registration on the Supplemental Register is not by itself a conclusive determination that a mark has not obtained secondary meaning, it is an admission against interest that the mark is not inherently distinctive.  That is, it is an admission that the mark is not inherently distinctive – not suggestive, arbitrary or

-19-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

1   fanciful.[14]  *See e.g. Novartis*, 53 U.S.P.Q. 2d at 1410, *quoting* 3 McCarthy on Trademarks and

2   Unfair Competition, § 19:33 at 19-72 and 19-75.[15]

3            Accordingly, CreAgri must prove both that its mark is not generic and that it

4   obtained secondary meaning to be eligible for protection as a trademark.  *Japan Telecom, Inc. v.*

5   *Japan Telecom America Inc.*, 287 F.3d 866, 873 (9th Cir. 2002) (affirming summary judgment

6   for failure to prove secondary meaning).  CreAgri must demonstrate that there is "a mental

7   recognition in buyers' and potential buyers' minds that products connected with the [mark] are

8   associated with the same source."  *Self-Realization Fellowship Church v. Ananda Church of Self-*

9   *Realization*, 59 F.3d 902, 911 (9th Cir. 1995) (affirming summary judgment for failure to prove

10  secondary meaning).  Summary judgment is appropriate unless CreAgri can "come forward with

11  enough evidence of secondary meaning to establish a genuine dispute of fact."  *Japan Telecom*,

12  287 F.3d at 873.

13           "To qualify for trademark protection, an owner of a descriptive mark must

14  demonstrate that the mark had acquired secondary meaning before its competitor commenced

15  use of the mark."  *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 564 (2d Cir. 1990).

16  Courts look to a number of factors in evaluating the sufficiency of evidence of secondary

17  meaning, "including '(1) whether actual purchasers of the product bearing the claimed trademark

18  associate the trademark with the producer, (2) the degree and manner of advertising under the

19  _____

20  [14] Indeed, the PTO could easily have determined that OLIVENOL, since it means "olive oil," is

21  generic and not merely "deceptively misdescriptive."  That is, the mark designates a genus of
    goods, olive oil.  "Supplemental Registration does not entitle a term 'to any statutory

22  presumption that the term is a trademark and not a generic name:  'In fact, it is not prima facie
    evidence of anything except that the registration issued.'"  *Novartis*, 53 U.S.P.Q. 2d at 1412,

23  *quoting* 3 McCarthy § 19:36 at 19-74, and *In Re Medical Disposables Co.*, 25 U.S.P.Q. 2d 1801,
    1805 (T.T.A.B. 1992).  As the Third Circuit has held, such a term will be deemed generic even if

24  the mark holder has misdescribed the product, because the markholder "does not have the right

25  to prevent others from advertising" their products as having those qualities.  *Canfield*, 808 F. 2d
    at 308.  And others have in fact, done so here. *See* Kinnear Decl. Ex. F (CREAG09096)

26  [15] *Novartis* cites McCarthy at the references shown; the correct citation appears to be to 3

27  McCarthy § 19:35 at 19-127 & fn. 4, however.

                                    -20-

28  #8805 v1

claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.'" *Japan Telecom*, 287 F.3d at 873 (*quoting Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996). The weaker the descriptive mark, the stronger the showing of secondary meaning must be. *See Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). In this case, where the mark "OLIVENOL" actually designates a genus of goods, the mark is especially weak if it is even descriptive at all. It is "perilously close to the 'generic' line." *Computerland Corp. v. Microland Computer Corp.*, 586 F. Supp. 22, 25 (N.D. Cal. 1984).

Here, there is no evidence of actual confusion; there is no evidence through consumer surveys that buyers or potential buyers associate the OLIVENOL trademark with one producer; and there is no evidence that CreAgri advertised the OLIVENOL products before June 18, 2002, much less widely enough to create secondary meaning. By CreAgri's own words, its sales of the 25 mg labeled OLIVENOL tablets in 2001 and 2002 were very small – an introductory promotion. Its sales of the 5 mg labeled (and still misbranded) product apparently did not actually begin until <u>after</u> June 18, 2002. And even if sales began earlier, there is no evidence of significant sales before June 18, 2002.[16]

In *Japan Telecom*, a declaration from the plaintiff's president that it had received several phone calls and "many" letters intended for the defendant were found to be insufficient evidence of actual confusion to establish secondary meaning. 287 F.3d at 874. Nor were six declarations from customers considered probative. *Id.* at 874. Most tellingly, the Court also found evidence that the plaintiff had been using the mark since 1984 and had advertised in a community telephone directory insufficient evidence of the acquisition of secondary meaning to

---

[16] The amount of advertising and promotion CreAgri did *after* USANA began using its mark is irrelevant. *See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 439-440 (3d Cir. 2000).

-21-

#8805 v1

1  avoid summary judgment.  *Id.* at 875.  Here, there is far less evidence of use and advertising of

2  the mark.

3            Similarly, in *Self-Realization Fellowship Church*, the court found that

4  declarations from the plaintiff church's members and associates unpersuasive evidence of

5  secondary meaning in the mark "self-realization."  59 F.3d at 911-12.  The court affirmed

6  summary judgment even though the church had used the mark since 1935 and had, at the time of

7  the suit, annual sales of over $1.4 million on spiritual aid products bearing in part the "self-

8  realization" name.  *See* 59 F.3d at 904.  CreAgri cannot even make the inadequate showing

9  rejected in *Self-Realization Fellowship Church.*

10           The lack of secondary meaning before June 18, 2002 (or the finding that the mark

11 is generic) is a second, independent ground for summary judgment on all CreAgri's claims.

12 Without secondary meaning before June 18, 2002, OLIVENOL is not a senior, valid trademark.

13 **C.  Even If OLIVENOL Is A Valid Senior Mark, CreAgri Cannot Show Likely Confusion**

14           This case presents a simple failure of proof on issue of the likelihood of confusion

15 under *Sleekcraft*.  Most importantly, CreAgri cannot show that it has a strong mark.  Indeed, it is

16 the weakest possible mark.  If it is not generic, it is perilously close.  Weak marks receive only

17 the thinnest protection.

18           The goods are sold through separate marketing channels – USANA's products are

19 sold in personal encounters through a network marketing system, like Avon or Shaklee.  One on

20 one sales and promotion of products offer little chance that USANA's customers will confuse its

21 products with CreAgri's.  USANA's Olivol is a single ingredient among a vast array of

22 ingredients on products that are not named "Olivol."  CreAgri's OLIVENOL products are stand

23 alone products.  The products are high end dietary supplements, sold to people who by definition

24 are careful about what they buy to put in their bodies.  *See Worthington Foods, Inc. v. Kellogg*

25 *Co.,* 732 F. Supp. 1417, 1448-49 (S.D. Ohio 1990).  USANA could have had no intent to induce

26

27

28
                                              -22-

#8805 v1

confusion with OLIVENOL or palm off on CreAgri's goodwill – no one had heard of the product when USANA obtained its valid mark on the principal register in June 2002.

Finally, there is no direct evidence of actual or likely confusion.  Apart from consumer surveys, "Lay or even expert opinion about the likelihood of confusion is inadmissible or entitled to little weight." Richard L. Kirkpatrick, Likelihood of Confusion in Trademark Law, § 1.8.c, at 1-45 (PLI 1995); *Barnes Group Inc. v. Connell Ltd. Partnership,* 793 F. Supp. 1277 (D. Del. 1992) (expert opinion that confusion was likely, offered without any supporting empirical data or marketplace observations, could not be relied on); *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F. Supp. 2d 335, 337 (D.N.J. 2002) (same)

CreAgri cannot put on evidence to show likelihood of confusion under *Sleekcraft*.

**D.  The Same Undisputed Facts Compel Summary Judgment For USANA On All The Parties' Claims**

The same failure to establish a valid, senior trademark, and to show a likelihood of confusion, defeats all CreAgri's claims, and entitles USANA to relief on its counterclaims. CreAgri's First through Fourth Claims for Relief are all for statutory and common law trademark infringement, and all require proof of a valid senior mark.  Likewise, CreAgri's Fifth Claim for Relief for Unfair Advertising under California's Business and Professions Code section 17500 and following is based on its allegation that USANA's products are likely to be confused with CreAgri's alleged senior, valid trademark.  (Complaint, ¶ 31.)  CreAgri's Sixth through Eleventh Claims for Relief also depend on CreAgri's allegations of confusion with a valid, senior mark.

The fact of CreAgri's misbranding likewise entitles USANA to judgment on its claim for Declaratory Judgment (First Claim for Relief), cancellation of the OLIVENOL registration (Second), False Advertising/False Labeling (Third and Fourth), and unfair competition (Fifth).

-23-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CreAgri, Inc. v. USANA Health Sciences, Inc., Case No. C 03 3216 MMC

#8805 v1

IV.

**CONCLUSION**

For all the foregoing reasons, the Court should grant summary judgment in favor of USANA on all CreAgri's claims and on all USANA's counterclaims.

Dated:  December 17, 2004

HOLME ROBERTS & OWEN LLP


By: _____/s/_____
                    James Wesley Kinnear
                    Attorneys for USANA Health Sciences, Inc.

-24-

#8805 v1