United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CREAGRI, INC.,

        Plaintiff,

   v.

USANA HEALTH SCIENCES, et al.,

        Defendant

                              /

No. 03-3216 MMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT/ COUNTERCLAIMANT'S MOTION FOR SUMMARY JUDGMENT; DISMISSING IN PART COUNTERCLAIMS; VACATING HEARING**

(Docket No. 47)

     Before the Court is defendant/counterclaimant USANA Health Sciences, Inc.'s ("USANA") motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff/counterdefendant Creagri, Inc. ("Creagri") has filed opposition, to which USANA has replied. Having considered the papers filed in support of and in opposition to the motion, the Court deems the matter appropriate for submission on the papers, VACATES the hearing scheduled for January 21, 2005, and rules as follows.

**BACKGROUND**[1]

**A. "Olivenol"**

     On March 7, 2001, Creagri began selling a "dietary supplement," in the form of a tablet, under the brand name "Olivenol." (See Crea Decl., filed January 3, 2005, ¶ 13; Crea Dep. at

---

[1]The following facts are either undisputed or, to the extent disputed, are stated in the light most favorable to Creagri.

1  42:1-13.[2]) The "active ingredient" in Olivenol is "hydroxytyrosol," which is a "polyphenol"[3] found

2  in "water contained in the fruit of olives."   (See Crea Decl., filed January 3, 2005, ¶¶ 9, 20-21.)

3  In addition to hydroxytyrosol, Olivenol contains other polyphenols, (see id. ¶ 20), and, in at

4  least a trace amount, tyrosol, (see Crea Dep. at 74:14-21).  Although Olivenol further contains

5  fatty acids that are a "component of olive oil," Olivenol does not contain olive oil.  (See Crea

6  Dep. at 27:3-11, 27:20-25, 75:9-13.)  Since its introduction, Olivenol has had the "same

7  formulation." (See id. at 69:14-19.)

8       When Creagri began selling Olivenol tablets in March 2001, Creagri, in reliance on

9  testing performed by third parties Creagri had hired, stated on the label that each tablet

10  contained 25 milligrams ("mg.") of hydroxytyrosol.  (See Crea Decl., filed January 3, 2005,

11  ¶¶ 30-32.)  In "spring" 2002, after an "individual at a tradeshow" approached Creagri's

12  founder and "called into question the Hydroxytyrosol content of Olivenol," Creagri "promptly"

13  conducted "additional research" and concluded that Olivenol tablets contained 5 mg. of

14  hydroxytyrosol. (See id. ¶ 33.)  As a result, Creagri, in March 2002, changed the label of

15  Olivenol to state that each tablet contained 5 mg. of hydroxytyrosol.  (See Crea Dep. at 54:5-

16  15; Kinnear Decl., filed December 17, 2004, Ex. H, third page.)  Additionally, in March 2002,

17  Creagri began to sell Olivenol in both liquid and capsule form, and stated on the labels of

18  those products that each "serving size" of Olivenol contained 5 mg. of hydroxytyrosol.  (See

19  Crea Dep. at 54:11-15; Kinnear Decl. Ex. H, first and second pages.)[4]

20       On October 16, 2003, USANA, in the course of the instant litigation, filed a

21  counterclaim against Creagri, alleging that Olivenol contained less than 5 mg. of

22  Hydroxytrosol.  In response to that allegation, Creagri "conduct[ed] more tests," and, in

23

24       [2]Excerpts from the deposition of Roberto Crea are Exhibit A to the Declaration of
   James Wesley Kinnear.
25
       [3]Polyphenols are "naturally-occurring compounds in plants."  (See Crea Decl., filed
26  January 3, 2005, ¶ 21.)

27       [4]According to the labels, the serving size of the liquid form of Olivenol is one millileter,
   and the serving size of the capsule form is one capsule.  (See Kinnear Decl. Ex. H, first and
28  second pages.)

2

1   February 2004, changed the Olivenol label, this time to reflect that Olivenol had "5 mg. of

2   'polyphenols.'" (See Crea Decl., filed January 3, 2005, ¶¶ 35-36.)  As of November 2004,

3   Creagri's tests show that Olivenol contains "at least 2.5 to 3 milligrams per tablet" of

4   hydroxytryrosol.  (See Crea Dep. at 84:5-14.)

5        On January 4, 2002, Creagri filed an application with the United States Patent and

6   Trademark Office ("PTO"), seeking to register Olivenol as a mark, in connection with a

7   "nutraceutical for use as a dietary supplement."  (See Kinnear Decl. Ex. D at 5072.)  On April

8   11, 2002, the PTO refused to register Olivenol on the "Principal Register," after concluding

9   that the term was "deceptively misdescriptive of the goods."  (See id. Ex. D at 5080-81.)

10  Specifically, the PTO concluded that in light of Creagri's representation that Olivenol was the

11  German word for "olive oil," a representation confirmed by the PTO, consumers were likely to

12  purchase Olivenol on the belief it contained olive oil, although in fact it did not.  (See id.)  On

13  October 9, 2002, Creagri, in response to the PTO's refusal to register Olivenol on the

14  Principal Register, amended its application to request that the PTO register Olivenol on the

15  "Supplemental Register."  (See id. Ex. D at 5099.)  On February 4, 2003, the PTO granted the

16  application, as amended, and registered Olivenol on the Supplemental Register.  (See id. Ex.

17  E at 5073.)

18  **B.  "Olivol"**

19       USANA sells "vitamins, food supplements and health products."  (See Cuomo Decl.,

20  filed December 17, 2004, ¶ 6.)  "[A] number" of USANA products contain an "ingredient"

21  USANA calls "Olivol."  (See id. ¶ 7.)  Olivol contains multiple ingredients, "including tyrosol,

22  hydroxytyrosol, sugar conjugates of both tyrosol and hydroxytyrosol, verbascoside, and

23  numerous other minor components."  (See id. ¶ 9.)

24       On June 18, 2002, USANA filed an application with the PTO seeking to register Olivol

25  as a mark, in connection with an "olive extract polyphenolic complex used as an ingredient in

26  vitamins, minerals and nutritional supplements."  (See Kinnear Decl. Ex. G at 4127.)  On July

27  15, 2003, Creagri filed with the PTO a Letter of Protest, asserting that there existed a "strong

28  likelihood of confusion" between Olivenol and Olivol.  (See id. Ex. C.)  On November 11, 2003,

3

1  the PTO granted USANA's application, and registered Olivol on the Principal Register.  (See

2  id. Ex. G at 4164.)

3  **LEGAL STANDARD**

4       Rule 56 provides that a court may grant summary judgment "if the pleadings,

5  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

6  any, show that there is no genuine issue as to any material fact and that the moving party is

7  entitled to a judgment as a matter of law."  See Fed. R. Civ. P. 56(c).

8       The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

9  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v.

10  Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment

11  show the absence of a genuine issue of material fact.  Once the moving party has done so, the

12  nonmoving party must "go beyond the pleadings and by her own affidavits, or by the

13  'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

14  showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (quoting Rule

15  56(c)).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

16  more than simply show that there is some metaphysical doubt as to the material facts."

17  Matsushita, 475 U.S. at 586.  "If the evidence is merely colorable, or is not significantly

18  probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations

19  omitted).  When determining whether there is a genuine issue for trial, "'inferences to be

20  drawn from the underlying facts . . . must be viewed in the light most favorable to the party

21  opposing the motion.'"  See Matsushita, 475 U.S. at 587 (quoting United States v. Diebold,

22  Inc., 369 U.S. 654, 655 (1962)).

23  **DISCUSSION**

24       USANA argues that it is entitled to summary judgment as to each count set forth in

25  Creagri's complaint and as to each claim for relief set forth in USANA's Amended

26  Counterclaims.

27  **A. Creagri's Claims**

28       In its complaint, Creagri alleges eight counts against USANA.

1

### 1. Trademark Infringement Claims

2      In its first four counts, Creagri alleges claims of trademark infringement.  The First

3 Count alleges infringement of a registered trademark.  The Second Count alleges common

4 law infringement.  The Third and Fourth Counts allege that Creagri is entitled to recover for

5 injuries said to have occurred as a result of the infringement.

6      A trademark is "any word, name, symbol, or device" that is "used" by a person "to

7 identify and distinguish his or her goods, including a unique product, from those manufactured

8 or sold by others and to indicate the source of the goods, even if that source is unknown."  See

9 15 U.S.C. § 1127.

10      At the outset, the Court notes that because Creagri's mark Olivenol is registered on the

11 Supplemental Register, Creagri's substantive trademark rights are only those available under

12 common law.  See In re American Fertility Society, 188 F. 3d 1341, 1343 (Fed. Cir. 1999)

13 ("Supplemental registration confers no substantive trademark rights beyond those under

14 common law.") (internal quotation and citation omitted).[5]  Thus, there is no substantive

15 distinction between the First and Second Count.  Further, because the Third and Fourth

16 Counts differ from the first two counts only insofar as the two latter counts allege particular

17 injuries caused by the alleged infringement, the Court will consider, as do the parties, the first

18 four counts together.

19      To establish a trademark infringement claim, Creagri must demonstrate it has a "valid,

20 protectable trademark interest" in the subject mark.  See Brookfield Communications, Inc. v.

21 West Coast Entertainment Corp., 174 F. 3d 1036, 1046-47 (9th Cir. 1999).  Registration of a

22

23      [5]"[A] mark that is ineligible for registration on the Principal Register because it is 'merely descriptive' of the goods or services, may be registered on the Supplemental Register."  In re Bush Bros. & Co., 884 F. 2d 569, 570 (Fed. Cir. 1989) (internal citation
24 omitted).  "If the mark later acquires distinctiveness through use in commerce, 15 U.S.C. §§ 1052(f) (five years of substantially exclusive and continuous use as a mark may be
25 deemed prima facie evidence of secondary meaning), the mark becomes eligible for registration on the Principal Register."  Id.  "Registration on the Supplemental Register is not
26 evidence of ownership, validity, or the exclusive right to use, and may not be used to stop importations; but inter alia enables the registrant to satisfy registration requirements under the
27 trademark laws of foreign countries, enables the registrant to sue for infringement in federal court, and provides useful business information on a readily accessible, central register."  Id.
28 at 570 n. 2.

5

1  mark on the Principal Register "constitutes prima facie evidence of the validity of the

2  registered mark and of [the registrant's] exclusive right to use the mark on the goods and

3  services specified in the registration." See id. at 1047.  Here, as noted, USANA's mark Olivol

4  is registered on the Principal Register, and, consequently, USANA is entitled to a

5  "presumption" that it has the right to use the mark Olivol.  See id.  The presumption arises as

6  of "the filing date of [USANA's] trademark registration application," which, as noted, was June

7  18, 2002.  See id. at 1051 n. 13.  In order for Creagri to rebut the presumption that USANA

8  has the right to use Olivol, Creagri must demonstrate, inter alia, that "it used the mark in

9  commerce first," see id. at 1047, i.e., prior to June 18, 2002.

10        Courts, for the purposes of trademark infringement claims, have construed the requisite

11  "use" to mean "the name was lawfully used in commerce."  See, e.g., United Phosphorus, Ltd.

12  v. Midland Fumigant, Inc., 205 F. 3d 1219, 1125-26 (10th Cir. 2000) (acknowledging

13  "well-reasoned proposition that shipping goods in violation of federal law cannot qualify as the

14  'use in commerce' necessary to establish trademark rights"); Intrawest Fin. Corp. v. Western

15  Nat'l Bank, 610 F. Supp. 950, 959-60 (D. Colo. 1985) (holding bank "acquired no rights in the

16  mark," where bank used mark in violation of federal statute requiring banks to do business

17  under chartered name).

18        USANA argues that, as a matter of law, Creagri's use of Olivenol prior to June 18,

19  2002 was not lawful.  Specifically, USANA argues that because the labels employed by

20  Creagri on Olivenol falsely stated the amount of hydroxytyrosol contained therein, Olivenol was

21  "misbranded" in violation of the Food, Drug and Cosmetic Act ("FDCA").  See 21 U.S.C.

22  § 331(a) (providing "introduction . . . into interstate commerce of any food . . . that is

23  misbranded" is "prohibited" act); 21 U.S.C. § 343(a) (providing "food shall be deemed to be

24  misbranded" if label "is false or misleading in any particular"); 21 U.S.C. 321(ff) (providing

25  "dietary supplement" is "deemed to be a food" for purposes of FDCA).[6]

26  _____

27        [6]Creagri argues that the Court lacks jurisdiction to determine whether Creagri's labels
    were violative of the FDCA.  The cases on which Creagri relies for this proposition, however,
    are distinguishable because they address a plaintiff's attempt to state a claim for relief based
28  on the defendant's alleged violation of the FDCA.  See, e.g., Summit Tech., Inc. v. High-Line

1    District courts as well as the Trademark Trial and Appeal Board ("TTAB") have held

2    that for purposes of determining whether use of a mark is unlawful under a particular regulatory

3    act, a use is deemed "unlawful" if the "issue of compliance has previously been determined

4    (with a finding of non-compliance) by a court or government agency having competent

5    jurisdiction under the statute involved," or "where there has been a per se violation of a statute

6    regulating the sale of a party's goods" and such violation is more than "de minimis."  See Erva

7    Pharmaceuticals, Inc. v. American Cyanamid Co., 755 F. Supp. 36, 41 (D. P.R. 1991)

8    (holding plaintiff did not have protectible interest in mark SUPRA, and thus could not prevail on

9    trademark infringement claim, where plaintiff's SUPRA product was misbranded and violation

10   was "not de minimis"); see also, e.g., Kellogg Co. v. New Generation Foods Inc., 6 U.S.P.Q.

11   2d 2045 (TTAB 1988) (denying request to cancel registration of trademark on ground of

12   unlawful use, where party seeking to cancel registration failed to show registrant committed

13   per se violation of labeling regulations).

14   Federal regulations require that food labels contain certain information as to "dietary

15   ingredients" for which the Food and Drug Administration ("FDA") has not established either a

16   "Reference Daily Intake" ("RDI") or a "Daily Reference Value" ("DRV").  See 21 C.F.R.

17   §§ 101.36(b)(3), 101.36(f)(1).  Specifically, if such an ingredient is added to a food, the

18   ingredient found in the food must be "at least equal to the value for that nutrient," see 21 C.F.R.

19   §§ 101.9(g)(3)(i), 101(g)(4)(i), or, if the ingredient is "naturally" found in the food, and not

20   additionally added thereto, the nutrient must be "at least equal to 80 percent of the value for

21   that nutrient declared on the label," see 21 C.F.R. §§ 101.9(g)(3)(ii), 101(g)(4)(ii).

22   The FDA has not established an RDI or a DRV for Olivenol's active ingredient,

23   hydroxytyrosol.  See 21 C.F.R. §§ 101.9(c)(8)(iv), 101.9(c)(9).  There is no evidence, nor could

24   there be, that hydroxytyrosol is "naturally" found in Olivenol, a manufactured dietary

25   _____

26   Med. Instruments Co., 933 F. Supp. 918, 932-34 (C.D. Cal. 1996).  In this line of cases, the
     courts reasoned that because no private cause of action exists under the FDCA, a district
27   court lacks jurisdiction to consider a federal claim where a plaintiff relies on another federal
     statute as a vehicle to seek relief for a violation of the FDCA.  See, e.g., id. (dismissing, for
28   lack of jurisdiction, plaintiff's Lanham Act claim because it was "impermissible private vehicle"
     to enforce FDCA).

7

1  supplement.  Rather, hydroxytyrosol in added to Olivenol, which is manufactured pursuant to a

2  patented method.  (See Crea Decl., filed January 3, 2005, ¶¶ 9-10, 20.)  Consequently,

3  federal regulations require that hydroxytyrosol be, in fact, found in Olivenol in a quantity "at

4  least equal" to that stated on the label.  See 21 C.F.R. § 101.9(g)(4)(i).

5         As discussed above, it is undisputed that in March 2001, when Creagri first began

6  selling Olivenol, at that time only in tablet form, the labels stated that each tablet contained 25

7  mg. of hydroxytyrosol.  It is further undisputed that in March 2002, when Creagri was selling

8  Olivenol in liquid, capsule, and tablet form, the labels stated that each serving size contained 5

9  mg. of hydroxytyrosol.  It is further undisputed that the composition of Olivenol has not changed

10  since its introduction in March 2001, and that Creagri has conceded, after the filing of the

11  instant action, that Olivenol has approximately 2.5 to 3 mg. of hydroxytyrosol per serving.

12  Accordingly, it is undisputed that at all times prior to June 18, 2002, the Olivenol labels falsely

13  stated the amount of hydroxytyrosol contained therein because Olivenol did not contain "at

14  least" the amount stated on the label, see 21 C.F.R. § 101.9(g)(4)(i),[7] and, thus, Olivenol was

15  misbranded in violation of 21 U.S.C. § 343(a)(1).

16         Creagri next argues that any violation was de minimis.  Creagri relies primarily on

17  General Mills Inc. v. Health Valley Foods, 24 U.S.P.Q. 2d 1270 (TTAB 1992), in which the

18  TTAB agreed with a trademark registrant's argument that its shipment of eighteen boxes of

19  cereal without a label containing "nutritional information as required by 21 CFR Section 101.9

20  et seq." constituted a de minimis violation of federal law.  See id. at 1273-76.  General Mills,

21  however, is distinguishable because that trademark registrant had shipped numerous other

22

23         [7]Creagri argues that there is no evidence it intended to make a false statement on its
24  labels.  The statute prohibiting misbranding of food, however, does not have a scienter
   requirement.  See United States v. Johnson, 221 U.S. 488, 497 (1911) (holding "shipment is
25  punished by the statute if the article is misbranded, and [ ] the article may be misbranded
   without any conscious fraud at all").  Creagri further argues that it could have claimed an
26  exemption from § 101.9(g)(4)(i) that is available to certain "low-volume" companies, see 21
   C.F.R. § 101.9(j)(18), or where compliance is "not technologically feasible," see 21 C.F.R.
27  § 101.36(f)(2).  The short response to this contention is that there is no evidence Creagri
   applied for any exemption, see 21 C.F.R. § 101.9(j)(18)(iv) (providing procedure to claim
28  exemption for "low-volume" companies); 21 C.F.R. § 101.36(f)(2) (providing procedure to
   claim exemption where compliance "not technologically feasible"), let alone received one.

1  boxes of cereal under the mark in question, none of which were misbranded.  See id. at 1276.

2  In other words, in General Mills, as opposed to the instant case, the registrant had in fact

3  regularly engaged in the lawful use of the mark in commerce, and the character of that use

4  was not altered by an isolated violation involving a proportionally very small number of units.

5  Here, by contrast, it is undisputed that every shipment of Olivenol that occurred prior to

6  June 18, 2002 was misbranded.  Further, the misbranding here was with respect to the only

7  active ingredient in the product.  Given that one of the primary purposes of statutes and

8  regulations governing the content of food labels is to "to advise purchasers what they are

9  buying," see Royal Baking Powder Co. v. Donohue, 265 F. 406, 408 (9th Cir. 1920), Creagri's

10  violation was, in essence, total in nature, rather than de minimis, see, e.g., In re Pepcom

11  Industries, Inc., 192 U.S.P.Q. 400, 401 (TTAB 1976) (holding where registration applicant

12  offered specimen labels for soft drinks that did not contain "name of goods" as required under

13  FDCA, and applicant failed to otherwise show it sold any soft drinks with a proper label prior

14  to date it filed for registration, applicant failed to show any lawful use of mark).

15  Accordingly, USANA is entitled to summary judgment on Creagri's First, Second,

16  Third, and Fourth Counts, all of which allege trademark infringment, and all of which are

17  dependent on evidence, which Creagri has not offered, that it was lawfully using the mark

18  Olivenol in commerce prior to June 18, 2002.

19  **2. State Law Claims**

20  In its Fifth Count, Creagri alleges a violation of § 17500 of the Business & Professions

21  Code, which prohibits false advertising.  In its Sixth Count, Creagri alleges a violation of

22  § 17200 of the Business & Professions Code, which prohibits unfair or unlawful acts.  In its

23  Seventh Count, Creagri alleges a common law claim of unfair competition.  In its Eighth Count,

24  Creagri alleges a claim of intentional interference with economic relationship, based on its

25  expectation of Olivenol sales to the public.  In its Ninth Count, Creagri alleges a claim of

26  negligent interference with economic relationship, also based on its expected sales of

27  Olivenol.  Each of these five state law counts are wholly predicated on USANA's alleged acts

28  of trademark infringement.  (See Compl. ¶¶ 31-32, 34-35, 38, 43-44, 50-51.)  For the reasons

9

1  stated above, Creagri cannot prove a claim of trademark infringement and, consequently,

2  cannot establish any of its state law claims.

3  　　　Accordingly, USANA is entitled to summary judgment on Creagri's Fifth, Sixth,

4  Seventh, Eighth, and Ninth Counts.

5  **B.  USANA's Counterclaims**

6  　　　In its amended counterclaims, USANA alleges five claims for relief.

7  　　　**1.  Declaratory Relief**

8  　　　In its First Claim for Relief, USANA seeks a declaration that its use of the mark Olivol

9  does not infringe on Creagri's mark Olivenol.

10  　　　For the reasons stated above, USANA is entitled to summary judgment on this claim

11  and, specifically, is entitled to a declaration that its use of the mark Olivol does not infringe on

12  Creagri's mark Olivenol.

13  　　　**2.  Cancellation**

14  　　　In its Second Claim for Relief, USANA petitions for cancellation of the PTO's

15  registration of the mark Olivenol on the Supplemental Register, Registration No. 2,684,940.

16  See 15 U.S.C. § 1119 (providing district court, in any action involving "registered mark," may

17  order cancellation of registration).

18  　　　As noted, on January 4, 2002, Creagri filed its application for registration of the mark

19  Olivenol on the Principal Register; on October 9, 2002, Creagri amended the application to

20  request registration on the Supplemental Register; and on February 4, 2003, the PTO granted

21  the application and registered Olivenol on the Supplemental Register.

22  　　　In order to be entitled to registration on the Supplemental Register, the applicant must

23  show the mark was "in lawful use in commerce." See 15 U.S.C. § 1091(a).  Such lawful use

24  must have occurred "prior to the filing date of the application." See In re Pepcom Industries,

25  192 U.S.P.Q. at 401.

26  　　　For the reasons discussed above, USANA has shown that it is undisputed Creagri did

27  not lawfully use the mark Olivenol in commerce prior to June 18, 2002.  Further, it is

28  undisputed that the Olivenol labels in use prior to February 2004 did not accurately state the

1   amount of hydroxytyrosol in Olivenol.  (See Crea Decl., filed January 3, 2004, ¶¶ 34-36;

2   Kinnear Decl. Ex. H.)  Consequently, whether the application date is deemed to be January 4,

3   2002, the application for registration on the Principal Registry, or October 9, 2002, the date

4   Creagri amended its application to request registration the Supplemental Register, USANA

5   has shown that it is undisputed Creagri failed to make "lawful use in commerce" of the mark

6   Olivenol prior to the filing date of the application.

7          Accordingly, USANA's petition for cancellation will be granted.

8          **3.  False Advertising**

9          In its Third Claim for Relief, USANA alleges that it is entitled to restitution and other

10  equitable relief, under the Lanham Act, as a result of Creagri having labeled Olivenol in a

11  manner violative of federal FDA regulations.

12         As discussed above, see n. 6, supra, no private cause of action exists under the FDCA

13  or FDA regulations.  See Summit Technology, 933 F. Supp. at 932-33 (citing cases).

14  Consequently, as Creagri points out, the Court lacks jurisdiction to consider a Lanham Act

15  claim premised on a violation of FDA regulations.  See id. at 933-34.

16         Accordingly, USANA is not entitled to summary judgment on its Third Claim for Relief.

17  Moreover, because the Court lacks jurisdiction over the claim, the Court will dismiss the claim

18  without prejudice.  See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the

19  parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall

20  dismiss the action.")

21         **4.  State Law Claims**

22         In its Fourth Claim for Relief, USANA alleges a claim under § 17500 of the Business &

23  Professions Code.  In its Fifth Claim for Relief, USANA alleges a claim under § 17200 of the

24  Business & Professions Code.  Both claims are premised on Creagri's having made false

25  statements on Olivenol labels.  (See Amended Counterclaims ¶¶ 50, 53-43.)

26         USANA alleges the Court's jurisdiction over these two state law claims is supplemental

27  in nature.  See id. ¶ 5; see 28 U.S.C. § 1367(a).

28         A district court may decline to exercise supplemental jurisdiction where "the district

11

1  court has dismissed all claims over which it has original jurisdiction." See 28 U.S.C.

2  § 1367(c)(3).  Where a district court has granted summary judgment on the federal claims

3  alleged, the district court, pursuant to § 1367(c)(3), may properly decline to exercise

4  supplemental jurisdiction over the remaining state law claims.  See Bryant v. Adventist Health

5  System/West, 289 F. 3d 1162, 1169 (9th Cir. 2002).

6          Accordingly, the Court will decline to exercise jurisdiction over the Fourth and Fifth

7  Claim for Relief, pursuant to § 1367(c)(3).

8                                          **CONCLUSION**

9          For the reasons stated above, USANA's motion for summary judgment is hereby

10  GRANTED in part and DENIED in part, as follows:

11          1.  USANA is hereby GRANTED summary judgment in its favor on each count in

12  Creagri's complaint.

13          2.  USANA is hereby GRANTED summary judgment in its favor on the First and

14  Second Claims for Relief in its Amended Counterclaims and, accordingly:

15                  a.  the Court DECLARES that USANA's use of the mark Olivol does not infringe

16  on Creagri's mark Olivenol.

17                  b. Registration No. 2,684,940 on the PTO's Supplemental Register is

18  CANCELLED.

19          3.  In all other respects, USANA's motion is denied.

20          4.  USANA's Third, Fourth, and Fifth Claims for Relief are hereby DISMISSED, without

21  prejudice.

22          The Clerk shall close the file and terminate any pending motions.

23          **IT IS SO ORDERED.**

24

25  Dated: January 26, 2005                          /s/ Maxine M. Chesney
                                                     MAXINE M. CHESNEY
26                                                   United States District Judge

27

28

12